# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**TONY BURBANK, #432026**                          **CIVIL ACTION**

**VERSUS**                                         **NO. 06-2121**

**N. BURL CAIN, WARDEN**                           **SECTION "C"**
**LOUISIANA STATE PENITENTIARY**

## <u>ORDER AND REASONS</u>

Before this Court is a petition for habeas corpus relief by Mr. Tony Burbank pursuant to 28 U.S.C. § 2254.  As grounds for relief, petitioner claims that his due process and fair trial rights were violated when: 1) the trial court denied his right to cross-examine Cassandra Scott regarding her potential bias arising from her pending criminal charges; 2) the trial court denied his right to impeach Ms. Scott with evidence of a prior inconsistent statement; 3) either error had a "substantial and injurious effect or influence in determining the jury's verdict"; and, in the alternative,  4) the Louisiana Fourth Circuit Court of Appeal's harmless-error determination resulted from an unreasonable application of the Chapman standard.

Upon a thorough review of the trial, the direct appeal and remand, the habeas petition and memoranda, and applicable law, the Court has determined that petitioner's habeas corpus petition has merit. For the reasons set forth below, this petition is **GRANTED**.

## I.      Background and Procedural History

Petitioner is a state prisoner at the Louisiana State Penitentiary in Angola.[1]  The

following facts are edited from the Louisiana Fourth Circuit Court of Appeal opinion:

> Dr. Richard Tracy, a forensic pathologist… testified that Jeffrey Jackson suffered five gunshot wounds, two of which were fatal… [and] Larry Welch sustained five gunshot wounds to the back and right buttock, one of which passed through the heart and was immediately fatal.
>
> Officer Kevin Balancier testified that… [w]hen he arrived on the scene, he observed two black males lying face up on the street near a blue vehicle… Officer John Gahagan, a crime scene technician, processed the crime scene… [and] recovered eleven spent nine-millimeter casings and three bullets. Sergeant Louis Gaydash… testified that he took a statement from Paula Hess… [who] was sober and reluctant to talk. Detective Gerard Winbush, a firearms examiner, testified that… [a]ll the bullets were fired from the same weapon. The detective also testified that all the casings found on the scene were also from the same weapon.
>
> Paula Hess testified that on January 19, 1997, she went to Larry Welch's house. Larry, Larry's son, Cassandra Scott and another man were at the house. She and several others were drinking and doing drugs. Later that evening, Larry and a friend decided to get something to eat. Larry and his friend were shot outside of Larry's house. She testified that she did not remember anything about the shooting. She and Cassandra were in the front room talking. The next thing she remembered was being outside and seeing Larry and his friend lying dead in the street. She stated that she was intoxicated from the drugs and alcohol. Ms. Hess testified that she did not recall giving a statement to the police. She described the perpetrator as a big guy but not muscular. She was not able to identify the defendant as the perpetrator.
>
> Detective Robert Hoobler was the lead investigator in the homicide investigation…. [and] stated that witnesses to the incident were located inside the residence at 8816 Cohn Street. The witnesses told the detective that the victims were trying to push start the vehicle when the gunman appeared and started shooting. Detective Hoobler interviewed both Paula Hess and Cassandra Scott. He took a statement from Cassandra Scott. Ms. Scott stated that she was looking out of the front window of the apartment when the shooting occurred. Ms. Scott identified the defendant in a photographic lineup as the perpetrator. She knew the defendant by his nickname of "Dogboy."
>
> Detective Hoobler arrested the defendant and searched the defendant's house. He recovered a Smith & Wesson forty caliber semi-automatic pistol, one metal ammunition magazine, eleven live rounds of forty-caliber ammunition, and one live round of nine-millimeter Luger ammunition from the defendant's house. The

---

[1] Fed. Rec. Doc. 1, Petition for Writ of Habeas Corpus, *Burbank v. Cain*, No. 06-2121.

detective later learned that the blue car was stolen but had not been reported as stolen because the owner did not realize the vehicle was missing.

Cassandra Scott testified that she was at Larry Welch's house on Cohn Street at approximately 12:30 a.m. on January 19, 1997. She, Larry, Paula Hess and Jeffrey Jackson were using narcotics and drinking beer. Ms. Scott stated that she was hungry and Larry and Jeff decided to go to Church's Fried Chicken. She walked them to the door. By the time she closed the door and walked to the sofa, she heard gunfire. She looked out of the window and saw the defendant with a gun in his hand. After the shooting stopped, Larry called out her name. She went to him and he died in her arms. When the police arrived on the scene, Ms. Scott gave a statement to Detective Hoobler. Ms. Scott told Larry's son to go to his grandmother's house and tell his grandmother that Larry had died.

Ms. Scott admitted that she was incarcerated at the time of trial and had been incarcerated for several months. She stated that while she was in prison, an investigator hired by the defendant's family visited her. He told her that he could help her with her situation if she stated that she did not see the shooting. Ms. Scott then signed a paper that stated that she did not see the shooting. However, Ms. Scott recanted that statement and gave another statement that she did see the shooting. She identified the defendant in a photographic lineup as the perpetrator. She admitted to a prior conviction for crime against nature.

Robert Smith testified that the defendant's family employed him as a private investigator. At the time of trial, he was employed by OIDP as an investigator. Smith stated that he visited Cassandra Scott in jail. He told her that he had been hired by the defendant's family as an investigator and asked her if she would give him a statement. Smith denied making any promises or inducements in exchange for the statement. Ms. Scott asked him for his assistance in getting her children returned to her. Smith stated that he would try to help if he could.

Louis Burbank, the defendant's brother, testified that the defendant was with him at his girlfriend's house at the time of the shooting…. for a weekend party that began Friday night… and continued until Sunday, January 19, 1997. Burbank and the defendant learned of the shooting at a block party on Sunday afternoon. Randy Armstead and Perry White were… at the house of Ernesta Smith, Louis Burbank's girlfriend… [and] testified that the defendant was at the house the entire weekend.

Chrissy Burbank, the defendant's sister, testified that she had spent the week at Ernesta Smith's house while Smith's mother was out of town. She testified that the guys came over on Friday night and stayed until Sunday. Ernesta called 911 on Friday night because she was mad at Louis. The witness stated that the defendant was at the house the entire weekend. They learned that the defendant was wanted for murder when they went to the block party on Sunday afternoon.

Ernesta Smith, Louis Burbank's ex-girlfriend, testified that she had a weekend party at her house the weekend of January 17-19, 1997. Ms. Smith stated that the defendant was at her house from Friday night through Sunday morning. She admitted that she called 911 early Saturday morning because she was upset with Louis. A

police unit came to the house but she did not answer the door when the police officer knocked on the door. She learned that the defendant was wanted for murder at the block party on Sunday afternoon.

Claudia Burbank, the defendant's mother, testified that the police came to her house on January 22, 1997 to arrest the defendant. She stated that the defendant, Louis and Chrissy were at Ernesta Smith's house the weekend of January 17-19, 1997. Ms. Burbank testified that the officers found a gun under the sofa in her living room. She stated that Louis had found the gun about a week before the murder and gave the gun to his father. She thought her husband had gotten rid of the weapon. She stated she never saw the defendant with a gun.

Mary Knight, an employee with the New Orleans Police Department, testified that at approximately 1:37 a.m. on January 18, 1997, someone dialed 911 from 2018 Dumaine Street. Unit 104 was dispatched to the residence. The unit arrived at the residence at 1:54 a.m.

Eugene Jarrow testified that he had been incarcerated in parish prison since July of 1997. He stated that he knew Cassandra Scott and that she smoked crack. The witness admitted convictions for attempted second degree murder, attempted possession of marijuana, and possession of heroin.[2]

The Louisiana Fourth Circuit Court of Appeal affirmed petitioner's conviction on February 27, 2002, but vacated the sentence and remanded the case for resentencing.[3]  The Louisiana Supreme Court granted writs in part, reversing the appellate court on April 23, 2004.[4] Two errors were cited in the opinion. The district court erred: "in restricting defense cross-examination of the state's principal witness, Cassandra Scott, with regard to whether she had 'completed a plea agreement over a year ago to get one year and get out' of jail on her own pending criminal charges;"[5] and "by precluding the defense from presenting extrinsic evidence of a prior inconsistent statement made by Scott to Eugene Jarrow that she had falsely accused the defendant of killing the victim."[6]  The case was remanded to the Louisiana Fourth Circuit Court of Appeal for a determination of "whether the errors were harmless beyond a reasonable doubt

---

[2] *State v. Burbank*, 811 So.2d 1112, 1114-1117, 2001-0831 (La.App. 4 Cir. 2/27/02)).
[3] *Id.*
[4] *State v. Burbank*, 872 So.2d 1049 (La. 2004).
[5] *Id*. at 1049.
[6] *Id*. at 1051.

and therefore did not contribute to the jury's verdict."[7]  On remand, the errors were deemed

harmless by the Louisiana Fourth Circuit Court of Appeal, which then remanded the case to the

district court to correct the original sentencing error.[8]  The Louisiana Supreme Court denied

further writs on December 16, 2005.[9]  No application for post conviction relief was filed.

Petitioner filed this federal application for habeas corpus on April 19, 2006.[10]

## II.        Jurisdiction

Jurisdiction is proper under the Antiterrorism and Effective Death Penalty Act (AEDPA) if

the petitioner is "in custody" under the conviction he is attacking.[11]  Petitioner Burbank is confined

at the Louisiana State Penitentiary in Angola, therefore jurisdiction is proper.

## III.       Venue

Venue is proper under AEDPA in the district where the inmate is in custody or where

the state court conviction and sentence were obtained.[12]  Petitioner Burbank was convicted and

sentenced in Orleans Parish, therefore venue in the Eastern District of Louisiana is proper.

## IV.       Timeliness

The state submits that the petition is timely, and the Court agrees. Generally speaking, the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires that a petitioner bring

his Section 2254 claims within one year of the date on which his conviction became final.[13]

---

[7] *Id*. Note: Judge Johnson dissented on the remand order. "The court of appeal erred in finding that the trial court did not improperly curtail the cross-examination testimony of the State's star witness, Cassandra Scott. At the time of the defendant's trial, Scott was incarcerated on a drug-related charge and was facing a multiple bill as a fourth felony offender and a possible sentence of 20-years to life imprisonment. The defendant should have been afforded the opportunity to inform the jury these charges against Scott, as well as the suspicious timing of various actions taken by the prosecution. *State v. Brady*, 381 So.2d 819 (La.1980). In my mind, this is not harmless error. Therefore, I would reverse the defendant's conviction and sentence and remand this case to the district court for a new trial."
[8] *State v. Burbank*, 893 So.2d 109 (La. App. 4th Cir. 2004).
[9] *State. v. Burbank*, 917 So.2d 1082 (La. 2005).
[10] *Id*.
[11] 28 U.S.C. § 2241(c)(3); 28 U.S.C. § 2254(a).
[12] 28 U.S.C. § 2241(d).
[13] 28 U.S.C. § 2244(d).

Pursuant to 28 U.S.C. § 2244(d)(1)(A), petitioner's one-year limitation period for seeking federal habeas corpus relief commenced running on the date the judgment "became final by the conclusion of direct review or the expiration of the time for seeking such review." Petitioner's direct appeal was denied by the Louisiana Supreme Court on December 16, 2005, and he did not appeal to the United States Court Supreme Court. Petitioner's conviction became final 90 days after the Supreme Court of Louisiana denied his application for supervisory writs, on March 16, 2006. On this date, the one-year statute of limitations for filing a federal habeas corpus petition began to run.[14] Petitioner filed his federal habeas petition on April 19, 2006, 34 days later.

For the reasons stated above, the Court finds that Mr. Burbank's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 is timely.

## V.     Exhaustion

Petitioner has exhausted available state remedies as required by AEDPA. Under AEDPA, a petitioner must first exhaust his remedies in state court before seeking habeas relief from the federal courts.[15] "To exhaust, a petitioner must have fairly presented the substance of his claim to the state courts."[16] Generally, the exhaustion requirement is satisfied only when the grounds urged in a federal habeas petition were previously presented to the state's highest court in a procedurally proper manner according to state court rules.[17]

Petitioner presents four claims for review in his petition as listed above. Each was raised in his application for writs of certiorari to the Louisiana Supreme Court on appeal. Accordingly, petitioner has satisfied AEDPA's exhaustion requirement. Therefore, the Court will address petitioner's claims on the merits.

---

[14] See *Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir. 2003); *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999).
[15] 28 U.S.C. § 2254(b)(1)(A).
[16] *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) (internal quotation marks omitted).
[17] *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988).

## VI.    Standard of Review

AEDPA comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of fact and law.[18]  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).[19]  As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[20]  The United States Supreme Court has noted the following:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams v. Taylor*, 529 U.S. 362 (2002) that an unreasonable application is different from an incorrect one.[21]

As to questions of fact, factual findings are presumed to be correct, and a federal court will give great deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[22]

---

[18] 28 U.S.C. § 2254(d): An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

[19] *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

[20] 28 U.S.C. § 2254(d)(1).

[21] *Bell v. Cone*, 535 U.S. 685, 694 (2002), internal citations omitted.

[22] 28 U.S.C. § 2254(d)(2); see also *Hill v. Johnson*, 210 F.3d 481, 485; 28 U.S.C. § 2254(e)(1).

## VII.   Law & Analysis

### 1) Petitioner argues the trial court denied his constitutional right to cross-examine Cassandra Scott regarding her potential bias arising from her pending criminal charges.

On appeal, the Louisiana Supreme Court found the trial court had committed error:

> The district court erred in restricting defense cross-examination of the state's principal witness, Cassandra Scott, with regard to whether she had "completed a plea agreement over a year ago to get one year and get out" of jail on her own pending criminal charges. Although the charges were eventually resolved by a not guilty verdict rendered in a bench trial in which Scott was represented by another attorney, the witness acknowledged at defendant's trial that she expected to plead guilty in her case set for the following morning. The witness also acknowledged that she had three prior felony convictions. However, the trial court sustained the state's objections to further cross-examination by the defense aimed at establishing that Scott faced a possible life sentence as a fourth offender if convicted in her own case, see La.R.S. 15:529.1(A)(1)(c)(i), and that the preliminary negotiations of a plea bargain, unilaterally recorded on a plea form by Scott's former attorney that was not adopted by either the state or the court, evidently concerned not only a one-year sentence but also an agreement by the state to forego charging Scott as an habitual offender.
>
> Although the plea negotiations between Scott and the state were not finalized, it is settled that "[a] witness's bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding his conduct." *State v. Vale*, 95-1230, p. 4 (La.1/26/96), 666 So.2d 1070, 1072; see also *State v. Rankin*, 465 So.2d 679, 681 (La.1985). ("The possibility that the prosecution may have leverage over a witness due to that witness'[s] pending criminal charges is recognized as a valid area of cross-examination.") Scott acknowledged that the state had continued trial in her case over 20 times, and had reset it again to coincide with defendant's trial, timing which may have raised a reasonable belief in the witness that some connection existed between her testimony against the defendant and resolution of her own charges. That the witness had spent over two years in jail awaiting trial would not have negated a reasonable expectation or belief based on the preliminary negotiations in her case that the court would, in effect, sentence her to time served in her own case in the event it imposed a sentence of one year imprisonment at hard labor after she testified against the defendant in the present case. By foreclosing cross-examination of Scott on her expectations for her own case, the trial court unduly "restricted the inquiry into the witness's motive and interest in testifying for the state and thereby frustrated an 'important function of the constitutionally protected right of cross-examination.'" *State v. Vale*, 96-2953, p. 1 (La.9/19/97), 699 So.2d 876, 877 (quoting *Vale*, 95-0577 at 4, 666 So.2d at 1072).[23]

---

[23] *State v. Burbank*, 872 So.2d 1049 (La. 2004). Note the dissent quoted in footnote 7.

On remand, the Louisiana Fourth Circuit Court of Appeal found the error harmless:

> The Supreme Court held that the trial court erroneously restricted the defendant's cross-examination of Cassandra Scott about the existence of a plea agreement. Ms. Scott testified that she did not have a plea agreement with the State. The defendant sought to introduce testimony that Ms. Scott had an informal agreement with the State that she would serve only one year on her charge of possession of cocaine. While the trial court did not allow the defendant to introduce evidence of such an informal agreement, the defendant was allowed to introduce testimony through his cross-examination of Ms. Scott that her case was continued over twenty times and the most recent hearing was to be held the day after defendant's trial. The defendant also had Ms. Scott admit on cross-examination that she had three prior felony convictions and could possibly be sentenced to serve twenty years to life in prison…
>
> In the present case, Cassandra Scott's testimony was crucial to the prosecution's case. Ms. Scott was the only person who could, and did, identify the defendant as the person who killed the victims. In fact, the prosecution's case rested entirely upon Ms. Scott's testimony. However, while the trial court erred in limiting Ms. Scott's testimony about an alleged plea agreement, the defendant was allowed to question Ms. Scott about her prior convictions and the effect the prior convictions would have on her sentencing for the offense for which she was presently incarcerated. Ms. Scott acknowledged that she had three prior felony offenses and that she could be sentenced from twenty years to life imprisonment. She also testified that her case had been continued over twenty times and was presently set for the day after the defendant's trial. Ms. Scott denied that a plea agreement existed. Defendant sought to introduce evidence of a preliminary agreement which had existed between Ms. Scott and the State. The defendant proffered the testimony of Scott's attorney who stated that there was no formal plea agreement but that an agreement had been discussed but was never formalized. Ms. Scott eventually went to trial and was acquitted of the offense.
>
> Granted that the trial court erred in not allowing the defendant to introduce testimony of the potential plea agreement, the error was harmless because the defendant was allowed to introduce evidence of Ms. Scott's prior felonies and the fact that she could be sentenced to life imprisonment. Ms. Scott admitted during cross-examination that she knew she could possibly receive a lighter sentence if she cooperated with the State. She testified that if she pled guilty, she would probably be sentenced to thirty months in prison.[24]

The Louisiana Supreme Court denied petitioner's subsequent writ application in a four-to-three ruling, with a written dissent:

---

[24] *State v. Burbank,* 893 So.2d 109, 111, 113 (La.App. 4 Cir. 2004).

I would reverse defendant's conviction and sentence and remand the case for a new trial. There was no physical evidence linking the defendant to the crime. The State obtained the convictions based principally on the testimony of their star witness, Ms. Cassandra Scott. Scott participated in the day long drug and alcohol binge in the victim's apartment and whose abilities were seriously compromised. Further, at the time of the defendant's trial, Scott was incarcerated on an unrelated drug charge and potentially faced life imprisonment as a fourth felony offender had the district attorney chosen to multiple bill. The defendant should have been afforded the opportunity to inform the jury of these pending charges. State v. Brady, 381 So.2d 819, 821-822 (La.1980); see also State v. Vale, 95-1230, (La.1/26/1996), 666 So.2d 1070, 1072.

Further, Scott was allowed to plead guilty to a reduced charged on the day following her testimony against the defendant. Scott's plea agreement occurred after the State continued her case twenty-two (22) times.[25] Although, the State continues in its position that no promises were made to Scott, and she received no benefit for her testimony despite the waiver form in Scott's file which memorialized her plea bargain agreement that called for a sentence of one-year at hard labor and no habitual offender bill…

The State's burden in the harmless-error analysis requires it to show beyond a reasonable doubt that the excluded evidence could not have affected the jury's verdict. State v. Owunta, 99-1569 at 5 (La.5/26/00), 761 So.2d 528, 531(citing State v. Everidge, 96-2665, p. 8 (La.12/2/97), 702 So.2d 680, 685). The court of appeal made an [sic] factual error in finding that the state had met its burden with respect to the excluded evidence of Scott's plea bargain and sentence exposure in her own case, and the trial court's ruling otherwise deprived jurors of considering the possibility that Scott committed to an identification made under highly questionable circumstances to protect the deal in her own case...[26]

Here petitioner argues that he is entitled to relief on this constitutional claim of error which was recognized by the Louisiana Supreme Court notwithstanding the Louisiana Fourth Circuit Court of Appeal's subsequent ruling that the error was harmless. Further, petitioner argues that he is entitled to relief under the *Brecht*[27] standard, which sets out the harmless error standard applicable to constitutional errors established in habeas cases. The Court agrees.

---

[25] The Court notes that Ms. Scott did not, in fact, plead guilty the day after Mr. Burbank's conviction. Instead, she chose a bench trial, heard in the court of Judge Elloie, and was acquitted of all charges.
[26] *State v. Burbank*, 917 So.2d 1082 (La. 2005).
[27] *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

The Fifth Circuit applies the *Brecht* standard in federal habeas cases.[28]  The Fifth Circuit has articulated the *Brecht* standard as follows:

> Under *Brecht*, a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict.  It must have had a substantial effect or influence in determining the verdict.  We recognize, however, that if our minds are in virtual equipoise as to the harmlessness, under the *Brecht* standard, of the error, then we must conclude that it was harmful.  Moreover, the *Brecht* standard does not require in order for the error to be held harmful that there be a reasonable probability that absent the error the result would have been different.[29]

 The Court notes that a petitioner is given the benefit of the doubt by the Fifth Circuit if there is a close call on whether the error was harmless, but that is not necessary in this case. The evidence from the record supports petitioner's claim that, when viewing the trial record as a whole, this constitutional error had a substantial effect or influence on the jury's verdict. A defendant's right to confront and cross-examine a witness is a fundamental constitutional right.[30] The defendant must be allowed to demonstrate bias or self-interest motivating a witness's testimony.[31]  In light of the fact that testimony of the sole material witness able to connect the petitioner to the crime, Ms. Scott, was the subject of constitutional error found by the Louisiana Supreme Court and the undue restriction of the defense's inquiry into the plea agreement prevented petitioner from demonstrating her bias and self-interest, the Court is persuaded that this constitutional error had a substantial effect or influence in determining the jury's verdict.[32] Accordingly, the Court concludes that when applying the *Brecht* standard, the petitioner is entitled to the relief he seeks.

---

[28] *Corwin v. Johnson*, 150 F.3d 467, 476 (5th Cir.1998).
[29] *Tucker v. Johnson*, 242 F.3d 617, 629 (5th Cir. 2001).
[30] *Pointer v. Texas*, 380 U.S. 400 (1965).
[31] *Davis v. Alaska*, 415 U.S. 308 (1974).
[32] See additional discussion under claim number three.

**2) Petitioner argues the trial court denied his constitutional right to impeach Ms.**

**Scott with evidence of a prior inconsistent statement.**

On appeal, the Louisiana Supreme Court found the trial court had committed error.

The trial court erred further by precluding the defense from presenting extrinsic evidence of a prior inconsistent statement made by Scott to Eugene Jarrow that she had falsely accused the defendant of killing the victim. As a predicate for introducing extrinsic evidence of a witness's prior inconsistent statement, La.C.E. art. 613 requires only that the witness's attention first be "fairly directed ... to the statement ... and the witness has been given the opportunity to admit the fact and has failed distinctly to do so." Scott answered defense counsel's question by denying she even knew Jarrow and thereby failed to admit distinctly that she had made the statement. In addition defense counsel expressly informed the court that he intended to call Jarrow for impeachment purposes and that the "jury has to make [the] decision" as to whether Scott made the statement. Counsel thereby made clear that he intended to introduce Jarrow's testimony not to vouch substantively for the truth of Scott's out-of-court statements but only to prove that they were made and "to establish the fact of contradiction as a means of impeaching [the] witness's general credibility." *State v. Owunta*, 99-1569, p. 1 (La.5/26/00), 761 So.2d 528, 529.

Confrontation errors are nevertheless subject to harmless-error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Because the court of appeal agreed with the rulings of the trial judge, the court did not address the issue of harmless error, and that issue did not prompt this Court's grant of certiorari. It is therefore appropriate to remand the case to the court of appeal to determine on the record whether the errors were harmless beyond a reasonable doubt and therefore did not contribute to the jury's verdict in the present case. See *State v. Code*, 627 So.2d 1373, 1384-85 (La.1993); *State v. Gibson*, 391 So.2d 421, 426 (La.1980). In all other respects, the application is denied.[33]

On remand, the Louisiana Fourth Circuit Court of appeal found the error harmless:

In the case at bar, Ms. Scott testified that she did not know Eugene Jarrow and did not make any such statements to him. Defendant allegedly sought to impeach Ms. Scott's credibility by having Jarrow testify as to the statements Ms. Scott allegedly made to Jarrow. The Supreme Court believed that it was error to prevent such testimony. However, even though it may have been error, the error was harmless. Defendant had already introduced the testimony of Robert Smith, a private investigator hired by defendant's family, to impeach Ms. Scott's credibility. Through Smith's testimony, the defendant showed that Ms. Scott was willing to change her testimony if the investigator was willing to help her get custody of her children. Ms. Scott, herself, acknowledged that she changed her

---

[33] *State v. Burbank*, 872 So.2d 1049 (La. 2004).

testimony twice and told Smith that she did not see the defendant kill the victims. In addition, the defendant was allowed to introduce evidence of Ms. Scott's drug use. Jarrow testified that Ms. Scott was a "crackhead." Ms. Scott admitted that she used narcotics and that her present charge was for possession of narcotics. She stated that she had used cocaine and marijuana, in addition to alcohol, the night of the murders.

  In the present case, the jury's verdict came down to a question of credibility of the witnesses. Despite the number of alibi witnesses produced by the defendant, the jury chose to accept the testimony of Cassandra Scott. It did so completely aware of Ms. Scott's potential bias and prejudice. The jury was made aware of Ms. Scott's prior felony convictions, her present narcotics charge and the potential for life imprisonment if she was convicted of being a multiple offender. The jury also knew that her case had been continued twenty-three times and that Ms. Scott's case was set for hearing the day after the defendant's trial. The jury was also informed that Ms. Scott believed that if she cooperated with the State, she would probably be sentenced to thirty months in prison. The jury was also made aware of the number of times that Ms. Scott recanted her testimony and that she was willing to change her testimony to benefit herself. Given that the jury was well aware of Ms. Scott's possible bias, the trial court's errors were harmless.[34]

Here, petitioner argues that preventing Mr. Jarrow from testifying regarding Ms. Scott's and Mr. Jarrow's conversation was not harmless error. The state argues that Mr. Jarrow was allowed to testify that he knew Ms. Scott, and the jury previously heard her testify she did not know Mr. Jarrow, so the error was harmless. Petitioner argues that the error was not harmless because the purpose of Mr. Jarrow's testimony was not to allege the truth of the matter, that she told him the petitioner was innocent, but rather to demonstrate for the jury that Ms. Scott was willing to commit perjury, by lying to the jury about knowing Mr. Jarrow and about the conversation with Mr. Jarrow where she told him the petitioner was innocent. The limited testimony allowed, petitioner argues, is not a substitute for the testimony the trial court disallowed, given its impeachment value. The Court agrees.

---

[34] *State v. Burbank*, 893 So.2d 109, 114, 2001-0831, 7-9 (La.App. 4 Cir. 2004).

Mr. Jarrow was prevented from testifying about anything except that he knew Ms. Scott and that she did crack. The defense had brought him as an impeachment witness to demonstrate that Ms. Scott had lied to the jury about knowing Mr. Jarrow or telling him the petitioner was innocent, but the judge vehemently refused any testimony regarding the conversation, thereby denying the jury the information they required as fact finders in this case. In light of the fact that the trial judge allowed Ms. Scott to submit uncorroborated hearsay testimony of the existence of another witness who declined to testify because she did not want to be involved, and in light of the fact that the trial judge prevented Mr. Jarrow's testimony, calling it hearsay instead of allowing it to be used to impeach Ms. Scott after the defense's first attempt to impeach her with her denial of a plea agreement, the Court is persuaded that this constitutional error had a substantial effect or influence in determining the jury's verdict.[35] Accordingly, the Court concludes that when applying the *Brecht* standard, the petitioner is entitled to the relief he seeks.

**3) Petitioner argues that since both constitutional errors involved infringement on his ability to attack the credibility of the state's star witness, either error had a "substantial and injurious effect or influence in determining the jury's verdict."**

This claim was raised in petitioner's application for writs with the Louisiana Supreme Court upon the finding of harmless error by the Louisiana Fourth Circuit Court of Appeal after the original remand from the Louisiana Supreme Court finding constitutional error. The one-word denial did not assign reasons.

---

[35] See additional discussion under claim number three.

Petitioner argues that the Fifth Circuit has held that "the petitioner should prevail whenever the record is "so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of the error..."[36]  The court went on to state that "if our minds are 'in virtual equipoise as to the harmlessness' under the *Brecht* standard, of the error, then we must conclude that it was harmful."[37]  The state argues that a criminal defendant is entitled to a fair trial, not a perfect one.[38]  The Court agrees with the state's premise, but not its conclusion, finding the constitutional errors cited by the Louisiana Supreme Court on direct review were not harmless and precluded petitioner from receiving a fair trial. As to whether either error on its own would justify relief, the Court need not speculate, since in fact both constitutional errors did occur.

The Court is mindful that "collateral review is different from direct review,"[39] and that the writ of habeas corpus is "an extraordinary remedy,"[40] reserved for those petitioners whom "society has grievously wronged."[41]  The Court is also mindful of the significant social costs including the time and expense involved in retrying a criminal case. However, the writ of habeas corpus "is designed to guard against extreme malfunctions in the state criminal justice system."[42]

After a thorough review of the record, the Court finds this is such a case. The entirety of the state's material case against the petitioner rested upon the testimony of a crack addict who had been smoking crack, smoking marijuana and drinking alcohol all day long.[43] Ms. Scott originally denied to the police that she was a witness, then claimed to have witnessed the petitioner holding a gun from inside the house at approximately 1:00 a.m.

---

[36] *Robertson v. Cain*, 324 F.3d 297 (5th Cir. 2003), citing *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

[37] *Robertson v. Cain*, 324 F.3d 297 (5th Cir. 2003), citing *Woods v. Johnson*, 75 F.3d 1017, 1026-27 (5th Cir.1996).

[38] *United States v. Hasting*, 461 U.S. 499 (1983); *Brown v. United States*, 411 U.S. 223 (1973); *Bruton v. United Sta*tes, 391 U.S. 123 (1968).

[39] *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993).

[40] Id.

[41] Id. at 634.

[42] Id., citing Justice Stevens concurrence in *Jackson v. Virginia*, 443 U.S. 307 (1979).

[43] Ms. Scott's testimony, p. 109-135, Trial Transcript, Rec. Doc. 1, Exhibits 1-8.

She testified that she closed the door as the victims went to get food and returned to the sofa, whereupon hearing shots she first fell to the floor, then got up and looked out the window and saw the petitioner.  Ms. Scott testified that crack and marijuana and beer increased her powers of observation. She did not identify the petitioner until two days later from a photographic lineup at the police station, after she had been arrested. She admitted she had known the petitioner for several years. She admitted that she changed her story more than once, telling the police and an investigator at different times that she either did or did not see the petitioner holding a gun. Ms. Scott testified that she was held in jail for almost two years on pending charges, for which the state could have sought a multiple bill resulting in a 20-year-to-life sentence, since she already had three felony convictions for crimes against nature. She testified that she did not know she was facing such a long sentence. Ms. Scott testified her almost two dozen continuances were related to her testimony in another case, and that there was no plea agreement offered for her testimony.  Cross-examination regarding the plea agreement or other incentives offered to her for her testimony was prohibited. Impeachment testimony offered against her by a witness who claimed she had told him the petitioner was innocent was prohibited.

The two constitutional errors found by the Louisiana Supreme Court directly infringed upon petitioner's right to challenge the only material testimony the state provided allegedly connecting him to the crime. Had the defense been able to thoroughly cross-examine Ms. Scott regarding her plea agreement, and the signed waiver in her record[44] — regardless of whether it had been "formalized"[45] or not — the jury would have been explicitly informed

---

[44] The plea agreement was proffered outside the hearing of the jury.
[45] See appellate court's remarks in *State v. Burbank*  811 So.2d 1112, discussing state's plea agreement with Ms. Scott for a one-year sentence and declining to file a multiple bill against her. The fact that Ms. Scott was acquitted the next day is irrelevant to whether the jury had the right to know of the plea agreement.

about Ms. Scott's motivation for testifying, in addition to the severe consequences she faced if she did not cooperate with the state. It strains credulity to think the jury's verdict would not have been affected had they been informed that this witness was likely desperate to make the state's case succeed in order not to spend perhaps the rest of her life in jail. Had the defense been able to present Mr. Jarrow's testimony,[46] the jury would have been explicitly informed that Ms. Scott may have committed perjury.[47]  While the jury is the ultimate judge of the credibility of a witness, those two critical segments of testimony regarding the state's only material witness were withheld from the jury due to trial errors. Had there been other sufficient evidence, for instance, corroborating eyewitnesses, physical evidence of any kind, a confession, recovery of the weapon used in the shootings and its connection to the petitioner, crime scene fingerprints, DNA evidence — in short meaningful corroborative evidence to implicate the petitioner — perhaps the errors committed could be held harmless. That is not the case here. Under all the facts and circumstances of this case, there is no other substantial evidence connecting petitioner to the crimes, and it is a fundamental miscarriage of justice to allow his conviction to stand when the defense was twice prevented from confronting the state's only material witness, or challenging her testimony via another witness, in a meaningful way so as to provide the jury with all the necessary details regarding Ms. Scott's credibility.

---

[46] Mr. Jarrow's  testimony, p. 237-243, Trial Transcript, Rec. Doc. 1, Exhibits 1-8.
[47] The Court notes that while Mr. Jarrow's testimony was disallowed as hearsay, although it was not offered to prove the truth of the matter asserted but rather that Ms. Scott lied, the trial judge allowed significant hearsay testimony by Ms. Scott, over defense objections, concerning another alleged witness to the crimes who refused to come forward.

**VIII.   Conclusion**

Having considered the complaint, the record, and applicable law, the Court has determined the petitioner has demonstrated his state conviction and sentence present grounds for the relief requested.  Because the Court finds petitioner's claim sufficient in its own right to merit relief, the Court need not address petitioner's claim that the appellate court improperly applied the *Chapman* harmless-error test on direct review.

The petition of TONY BURBANK for writ of habeas corpus under 28 U.S.C. § 2254 is **GRANTED**.  Accordingly, **IT IS ORDERED** that the conviction and sentence of TONY BURBANK be and hereby are set aside. It is **FURTHER ORDERED** that the state either retry TONY BURBANK within 120 days of this order or dismiss the charges.  The state shall notify the defense and the Court of its intention within 30 days of this ruling.  Judgment will be entered accordingly.

New Orleans, Louisiana this 29th day of August, 2007.

HELEN G. BERRIGAN,
U.S DISTRICT JUDGE